UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
BAY CITY DIVISION

| | |
|---|---|
| Bridget D. Charles,<br><br>    Plaintiff,<br><br>v.<br><br>TransUnion, LLC,<br><br>    Defendant. | CASE NO. 1:25-cv-11613<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. |

COMES NOW Plaintiff **BRIDGET D. CHARLES** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt reaffirmed in her Chapter 7 bankruptcy.

2. Defendant TransUnion, LLC ("TransUnion") is inaccurately reporting Plaintiff's Northland Area Federal Credit Union ("Northland") account discharged through bankruptcy.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a

bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), the named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiff alleges that the Northland account covers a motor vehicle that was reaffirmed in her bankruptcy. Plaintiff alleges she was current on her vehicle payments at

the time of filing her bankruptcy and continued to make payments after filing bankruptcy. Subsequent to the reaffirmation, Plaintiff made all payments and has continued to do so until present.

15. Plaintiff alleges that TransUnion is incorrectly reporting Plaintiff's Northland account as discharged in bankruptcy. Further, TransUnion is incompletely and inaccurately reporting payment history even though Plaintiff made all payments since the reaffirmation and has continued to do so until present. Plaintiff alleges the Northland tradeline on her TransUnion report fails to list the debt as reaffirmed.

16. Plaintiff alleges it is patently incorrect to report a reaffirmed debt as discharged in bankruptcy.

17. Plaintiff alleges it is patently incorrect to report a reaffirmed debt as closed.

18. Plaintiff alleges it is patently incorrect to suppress payment history or report "no data" in the payment history in a month where payment was timely tendered and accepted.

19. Plaintiff alleges that "no data" reported in the payment history portion of a tradeline is acceptable reporting only when accurate payment history is not known during that particular month or when payments are not required during that particular month due to deferment, grace period, or forbearance.

20. Plaintiff alleges that the FCRA requires complete and accurate reporting; therefore, if an account is reported, it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

21. Plaintiff alleges that Defendant is familiar with the FCRA requirements and credit reporting industry standards and subscribes thereto.

22. Plaintiff alleges that Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

23. Plaintiff alleges that all of Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine her ability to repair her Credit Score.

24. In the alternative, Plaintiff alleges that Defendant's actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

25. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

26. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

27. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

28. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

29. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

30. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

31. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

32. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

33. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

34. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

35. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

36. Each of the five (5) factors is weighted differently by FICO.

37. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

38. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

39. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

40. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

41. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

42. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

43. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three-digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

44. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     e-OSCAR**

45. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

46. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

47. The ACDV contains codes next to certain data fields associated with a credit file.

48. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

49. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

50. For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.  Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

51. When a consumer files bankruptcy, certain credit reporting industry standards exist.

52. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

53. The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

54. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

55. The CII "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

56. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

57. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

58. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

59. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

60. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

61. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

62. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

63. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Reaffirmation Agreements**

64. A reaffirmation agreement is a legally binding agreement between a debtor and a creditor that reaffirms the debtor's obligation to pay a debt that would otherwise have been discharged in the bankruptcy.

65. Pursuant to 11 U.S.C. § 524(c), an agreement is enforceable if: (1) it is made before the discharge is entered, (2) the debtor receives certain required disclosures at or before signing the agreement, (3) the agreement is filed with the court and, if applicable, includes a declaration by the debtor's attorney that the debtor was given certain advisements, (4) the debtor does not rescind the agreement, and (5) the agreement does not impose undue hardship upon the debtor.

66. A commonly used reaffirmation agreement is Form B 240A.[2]

---

[2] This form template can be found on most bankruptcy court's websites.

67. Part V. of Form B 240A is titled, "Disclosure Statement and Instructions to Debtor(s)" which includes the following portion:

> 6. When will this reaffirmation agreement be effective?
>
> a. If you *were represented* by an attorney during the negotiation of your reaffirmation agreement and
>
> i. if the creditor is not a Credit Union, your Reaffirmation Agreement becomes effective when it is filed with the court unless the reaffirmation is presumed to be an undue hardship. If the Reaffirmation Agreement is presumed to be an undue hardship, the court must review it and may set a hearing to determine whether you have rebutted the presumption of undue hardship.

68. 11 U.S.C. § 524(m)(1) states there is presumed undue hardship if the debtor's monthly income less monthly expenses is less than the scheduled payments for the reaffirmation agreement. The court must review this presumption. This presumption expires 60 days after the agreement is filed with the court.

### E. Plaintiff's Debt was Reaffirmed in her Bankruptcy

69. Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on May 16, 2024, in order to repair her creditworthiness and Credit Score.

70. On or about June 24, 2024, Plaintiff executed a Reaffirmation Agreement, and it was filed with the court on June 27, 2024 ("Reaffirmation Agreement").

71. All requirements were met in order to satisfy 11 U.S.C. § 524; therefore, the Reaffirmation Agreement was effective upon its filing with the Court.

72. Plaintiff's bankruptcy was discharged on August 20, 2024.

### F. Plaintiff's Credit Report Contains an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail

73. On August 22, 2024, Plaintiff ordered a TransUnion credit report to ensure proper reporting by her creditors (the "August 22 Credit Report").

74. Plaintiff noticed an adverse tradeline in her August 22 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

75. Plaintiff then disputed the inaccurate tradeline regarding the Northland account via certified mail to TransUnion on or about January 16, 2025 (the "Dispute Letter").

76. Plaintiff's Dispute Letter specifically put TransUnion on notice that the account should not be listed as closed or discharged in bankruptcy since the account was reaffirmed.

77. Plaintiff's dispute letter included a copy of the signed Reaffirmation Agreement along with a copy of Plaintiff's payment history from Northland to support Plaintiff's contention that the account was not closed or discharged and that she had been and continued to make payments.

78. Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the Northland account reporting, addressing the tradeline individually.

79. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

80. Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letter and, in response, failed to send Plaintiff's dispute to Northland, as the data furnisher, via an ACDV through e-OSCAR.

81. On April 15, 2025, Plaintiff ordered a second TransUnion credit report to determine if the reporting on the account was updated.

    a. **Inaccuracy – Northland**

82. Despite actual knowledge, TransUnion continued to report Plaintiff's Northland account, beginning in 14181427XXXX, as closed, with a payment status of ">Account Included in Bankruptcy<", without a balance, without a monthly payment amount, with a comment of "CHAPTER 7 BANKRUPTCY", and with incomplete and inaccurate payment history. This is patently incorrect as this account is open, was reaffirmed, payments were made, and it was not discharged in bankruptcy.

83. Reporting a reaffirmed debt as discharged in bankruptcy is patently incorrect.

84. Reporting no payment history or reporting "no data" when payments have been made is patently incorrect.

85. Reporting an open and ongoing account as closed is patently incorrect.

86. In addition, this inaccurate and incomplete tradeline is misleading in a way that can adversely affect credit decisions.

87. Plaintiff alleges that TransUnion failed to investigate whether the account was reaffirmed, or whether the Plaintiff had been making payments since filing the Reaffirmation Agreement.

88. TransUnion failed to provided notice to Northland that Plaintiff was disputing the inaccurate and misleading information, and therefore TransUnion failed to conduct a reasonable investigation of the information as required by the FCRA.

89. Based on Plaintiff's dispute, the provided Reaffirmation Agreement (which Northland signed and was filed with the court), along with the Plaintiff's payment history, TransUnion should have known that Plaintiff's account was not discharged due to the Reaffirmation Agreement and that Plaintiff has maintained a positive payment history which was not being properly reported.

90. The most basic investigation would include a simple review of bankruptcy documents and other provided documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

91. Plaintiff alleges that TransUnion failed to review if its reporting complied with the FCRA or industry standards for credit reporting, the dispute letter or documents received, or Plaintiff's publicly available bankruptcy documents.

92. If TransUnion reviewed such standards and records, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were made on the account, and therefore, those payments should be reported.

93. TransUnion should have reported the CII Code as "R" and updated the account to accurately report all the payments made on the account.

94. By continuing to report Plaintiff's account as described hereinabove, it incorrectly appears to third parties viewing Plaintiff's credit reports that Plaintiff has not

properly made payments and that the account was discharged in her bankrupcy. This makes TransUnion's reporting misleading.

95. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

96. A discharged debt is treated far more derogatorily by a potential lender than one which was reaffirmed and reflects a consumer's ability to make payments month after month, year after year.

97. As payment history makes up thirty-five percent (35%) of a consumer's credit score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by TransUnion is lowering Plaintiff's Credit Score, which adversely affects her ability to obtain credit.

98. Further, even if a lender did look through the tradelines, based upon the reporting of TransUnion, it appears as if the Plaintiff has not made payments on the Northland account and that it was discharged in bankruptcy; all of which is inaccurate.

99. The lack of investigation and reporting of inaccurate and incomplete information by TransUnion is unreasonable.

**G.    Damages**

100. Plaintiff pulled her credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

101. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiff's rights to accurate credit reporting as intended by Congress.

102. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by TransUnion on the Northland account. Further, Plaintiff's

diminished creditworthiness, resulting from TransUnion's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

103. TransUnion's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
## (Against Defendant)

104. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     TransUnion Failed to Assure Credit Reporting Accuracy**

105. TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

106. Had TransUnion maintained reasonable procedures to assure maximum accuracy, TransUnion would have never reported the Northland account as described herein.

107. TransUnion knew, or should have known, (1) that the Northland account was not discharged in bankruptcy based on Plaintiff's dispute and attached documents, and (2) that the Northland account was reaffirmed and should be reported as such. Further, TransUnion knew, or should have known, that this inaccurate and incomplete reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

108. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting TransUnion allowed.

109. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.	Willful Violations**

110. TransUnion's violations, as described herein, were willful; specifically, TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

111. TransUnion regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, TransUnion regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

112. To the extent TransUnion does send consumer disputes, TransUnion sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

113. TransUnion's employees receive little to no training concerning how to accurately report consumer debt.

114. Instead, TransUnion's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

115. TransUnion's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

116. TransUnion has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

117. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

118. TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

119. In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

120. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

### (Against Defendant)

A. **TransUnion Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

121. Pursuant to 15 U.S.C. § 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Northland account.

122. Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

123. TransUnion is not a passive entity bound to report whatever information a data furnisher provides.

124. Plaintiff alleges TransUnion is readily familiar with the FCRA requirements and credit reporting industry standards.

125. Based on the foregoing, Plaintiff alleges that TransUnion can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

126. TransUnion can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

127. TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Northland was not reporting the account at issue correctly.

128. Had TransUnion conducted a proper investigation it could have updated the account to report as reaffirmed to indicate that the account was not discharged. Further, TransUnion could have updated the payment history of the account to indicate that payments were being made on the account. However, TransUnion continued to report the account as described herein.

129. TransUnion, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

130. Plaintiff alleges that TransUnion failed to send an ACDV to Northland to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing notice of the inaccuracies, TransUnion failed to delete or correct the tradeline or conduct an investigation.

131. In the alternative, if TransUnion deemed the dispute letter "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), TransUnion failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received such notice from TransUnion, Plaintiff alleges TransUnion deemed the dispute letter valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it failed to comply.

## THIRD CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
## (Against Defendant)

132. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. TransUnion Failed to Review and Consider all Relevant Information**

133. TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

134. Plaintiff alleges TransUnion failed to review the provided Reaffirmation Agreement and payment history, and did it seek to review any of Plaintiff's bankruptcy documents, including any from PACER or any other publicly available database. Had

TransUnion reviewed these documents, it would have seen the Northland account was reporting inaccurately and should be reported as open, reaffirmed, with complete and accurate payment history.

135. TransUnion's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

136. TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

137. In the alternative, TransUnion was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

138. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
### (Against Defendant)

139. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   TransUnion Failed to Delete Disputed and Inaccurate Information**

140. TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

141. TransUnion's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

142. TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

143. In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

144. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

145. WHEREFORE, Plaintiff prays for judgment as follows:

    a. For preliminary and permanent injunctive relief to stop Defendant from engaging in the conduct described above;

    b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

    f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

## DEMAND FOR JURY TRIAL

141. Plaintiff hereby demands trial of this matter by jury.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: May 30, 2025

*/s/ Joshua B. Lane*
Joshua B. Lane
TX Bar No. 24092665
P.O. Box 558
Spring Branch, TX 78070
Phone: (210) 541-2154
Fax: (210) 783-1383
josh@schumacherlane.com
Attorney for Plaintiff